Good morning. May it please the Court, my name is David Schlesinger from Jacob Schlesinger Oakland Shepherd in San Diego. I represent Petitioner Jose Alberto Cordova-Manzanarez. Despite Mr. Cordova's having provided what is tantamount to a more than 99% consistent account to his medical experts in his asylum application and supporting affidavits, and in extensive testimony at his asylum hearing, the BIA nevertheless determined that Mr. Cordova had not testified credibly. I'm having trouble seeing the overall structure of this case. Let's suppose we agreed with you. Then what? What is the basis for the asylum claim? There are two bases for the asylum claim, Your Honor. First is that Mr. Cordova is a member of a particular social group, which on remand we are prepared to define as individuals who were forcibly conscripted and forcibly tattooed against their will by gangs in El Salvador. So is he a group of one? I mean, it seems like Arteaga is a problem for you on asylum. Well, I should note, Your Honor, just to back up a bit, because the BIA did not address the unaccounted issue on merits in any way that Ventura and Thomas preclude this Court from in any way getting into the merits of the unaccounted. In addition to social group, Your Honor, we are prepared to make an unaccounted political opinion argument. In his testimony, Mr. Cordova specifically testified that he told the gangs upon the instance of his kidnapping, when he was kidnapped for several days, that he did not want to join them because he did not agree with them. But that claim has been rejected, hasn't it, in Santos-Limos and other cases? No, Your Honor. Distinguishing Santos-Limos, Santos-Limos was a case where the individual merely declined to join a gang. He never specifically confronted his persecutors with specific reasons. I'm pretty sure there are other cases where they said it's because I was going to go to the police and complain and it didn't work. All right. So Ventura's silent claim. Yes, Your Honor. How does this credibility issue interact, if at all, with the CAD issue? In the board's, in the BIA's May 2009 order, Your Honor, the BIA actually surprisingly appeared to assume that Mr. Cordova was credible for purposes of his CAD analysis. And it is our argument, Your Honor, that if you presume Mr. Cordova to be credible, all of the various findings that the board, that the BIA purported to make in support of its denying Mr. Cordova's CAD claim are not supported by substantial evidence. Well, now, there was other evidence besides the evidence that you presented. Are you saying the government did not put on any evidence that he wouldn't be tortured? The government proffered very limited country... Did the government put on any evidence? The government, in addition to submitting country condition evidence, Your Honor, did submit testimony from an expert on gang activity in the United States, Mr. Mata. So my question is, why are you not asking us to re-weigh the evidence? I understand why you think your evidence is better. They think their evidence is better. And, but why, but we don't re-weigh the evidence. Well, Your Honor, the... There was other evidence. There was other evidence, Your Honor, but the BIA did not specifically consider Mr. Mata's testimony for purposes of making its CAD determination. And I'd be prepared to go through all those findings one by one. But what I'm trying to understand, just to get the lay of the land, is the question of whether he was in fact forcibly tattooed relevant to the CAD claim. The fact that he bears tattoos... I understand that. But the credibility issue as to whether he was forcibly tattooed, is that relevant to the CAD claim? We do not believe that that is directly relevant to the CAD claim. Okay. And so to the extent that the, that this Court determines, as we are arguing, that the adverse credibility determination is not supported by substantial evidence... And finally, to further get the lay of the land, my understanding is that you are not relying for the CAD claim on the theory that's in some of the other cases, that gang members are going to attack him or torture him or whatever, with the acquiescence of the police. You're only relying on cleansing squads and the police themselves. That's correct, Your Honor. We're not making an argument based on what the gangs would be directing. Okay. Presumably that's because they actually did try and get him to identify the gang people and he just refused, said he was afraid to do it. He did refuse, claiming that he and his family would sustain retaliation as a result of doing so. And our argument, our theory on Kat, Your Honor, is that there are two groups, one of which, if you assume his testimony to be credible, the police, the PNC in El Salvador, have actually already beaten him on at least five separate occasions after questioning him about his gang affiliation related to his sporting these distorted and blurry tattoos. So in contrast to the argument that you just heard, there actually is evidence of record showing that the police did specifically single out Mr. Córdova because of the tattoos that he was sporting. We also have submitted evidence of record, Your Honor, regarding the existence of the notorious Sombra Negra paramilitary group, which actually originated in Mr. Córdova's home neighborhood of Milagro de la Paz in San Miguel, El Salvador. That group, as even the government's expert witness, Mr. Mata, acknowledged, is still existing and is still operating with relative impunity in San Miguel and throughout the country of El Salvador. What's the status of, I know that there was supposedly his mother's got an asylum claim pending and he would qualify for derivative asylum? That's correct, Your Honor. Surprisingly, 18 years after Ms. Manzanares filed her asylum claim, it still has not been adjudicated by the asylum office in Los Angeles. Does anybody know why? Have you looked into this? I do not, to the best of my knowledge, Your Honor, know why this has not been adjudicated. I think the government would be in a better position to do it than I would. And Mr. Córdova, unlike I think all the other petitioners here, has no disqualifying conviction himself? That's correct, Your Honor. He does not have any criminal record in the United States whatsoever, nor to our knowledge does he have one in El Salvador. Have you and the government talked at all about the possibility of mediating this case in order to see if you can resolve the asylum claim as to which he's derivative and not get to the rest of this? We have not specifically discussed that, Your Honor. However, as a personal matter, I'm always receptive to mediation whenever the government wants to engage in it, and I'd be willing to speak with opposing counsel following argument about that possibility. All right. And we sort of cut, or I cut you off with regard to your credibility issue, so you have two and a half minutes to say something. Sure. I'd like to reserve approximately one minute regarding one minute of my time for rebuttal, but let me quickly get to adverse credibility. On the first supposed ground of adverse credibility, the supposed inconsistency between Mr. Cordova's asylum declaration and his testimony at his hearing regarding the dates of the shootings. Because he got those, there was an inconsistency, I guess. He said they were both in 2000, that they were 2000 and 2002 or something? To the extent that there was at least initially an inconsistency, Your Honor, he said during his direct at the hearing that the first one occurred in 2000, the second occurred in 2002. On cross from the government's trial attorney and the IJ, Mr. Cordova corrected himself contemporaneously and said that both did, in fact, occur in 2002. So it's our position that there was never an inconsistency to begin with. And even if this Court were to determine that one did exist, it would be so insignificant or trivial that under Suretha, it does not constitute a basis for an adverse credibility. Once the IJ found that he first claimed to be shot twice in 2002, then recanted saying that he was shot once in 2000 and once in 2002, and then he switched again, claiming that he was shot the first time in 2002. It's our position, first, Your Honor, that the BIA did not adopt the IJ's reasoning on that issue, and so therefore it's only the BIA order that gets reviewed. And second, that even to the extent that you review the IJ, the IJ didn't actually state the evidence of record correctly. If there aren't any further questions... I have a question. You said that he had been tortured, but his testimony is that he was beaten with sticks several times. It's really hard to tell from that whether that was severe physical torment. I will acknowledge, Your Honor, that he didn't testify in sufficient robust detail regarding those incidents, but... Well, it's pretty important. It's important... He's got a great torture. I think that it's fair to say, Your Honor, that when most people are beaten by the police, it doesn't have to rise to the level of, say, a Rodney King-like incident that constitutes the infliction of severe pain or suffering. Well, I don't know. It seems to me there are degrees of police brutality. What about the fact that the... And I've wondered about this, because it hasn't come up in any of the cases, that the regulation seems to say that to be tortured, the person has to be in custody or under the physical control of the torturers. These seem to be kind of street confrontations. You can't really tell whether he was detained or arrested or what happened, or they just came up and beat him. And if they just came up and beat him, I gather, under the regulation, that wouldn't be torture. Well, I think that if you want to analogize this to American law enforcement procedures, Your Honor... Like a Terry stop or something? Exactly, Your Honor. I would argue that Mr. Cordova was stopped. He was asked for his gang affiliation. This is for his own testimony. And then once the police examined the tattoos, they started beating him, as he testified at least five times during the 1996 and 1998 period. Now, are you contending with regard to the CAC plan, that there is any procedural problem or that we just have to get to the merits of the question of whether the record shows that he was more likely than not to be tortured?  This Court has to review the specific findings of the BIA regarding that. Well, I understand that, but you're not claiming that they did anything wrong, procedurally wrong, in determining the CAC claim, are you? No, Your Honor. That was rectified when, after, in the September 07 order, the BIA failed to address CAC whatsoever. The government stipulated to a remand in the first iteration of this case. So we don't, at the present time, argue that there are any procedural defects regarding CAC. We're making solely a merits argument. I see. Okay, thank you very much. We'll give you a minute on your bill. Thank you, Your Honor. May it please the Court, Nicholas Harling for Respondents. The financial evidence supports the Board's adverse credibility determination, as well as the Board's denial of protection under the Commission. Is this a post-real ID? Yes, Your Honor, this is a post-real ID. Okay, so I have a question, just since we have a lot of these cases. How many people like this are out there? You know, gangbangers with tattoos. Is this a large group of people? Are you referring to the United States? That you're removing, yes, that you're removing. I'm sorry, Your Honor, I could not speak to the numbers with any type of authority. Of course, this person claims that he doesn't fit that category, that he was never a gang member and was forcibly inducted and tattooed. Yes, Your Honor. He's different than all the rest of them in that regard. Yes, he would be different in that regard. Is the government taking one position on people with tattoos being returned that have gang tattoos, or is this, are they, is there, is the government's position that they would never be a social group? Are you looking at them each case, or? The government looks at each case, and in these cases, like you said, they are very complicated, because it's the question of, if someone is returned with tattoos, will it be, sometimes the argument is that the government will persecute them. Sometimes it is the government won't protect them, which might be the same as the persecution or the torture. Sometimes it's a rival gang. Sometimes it's their former gang. Sometimes it's the vigilante groups. So they're very complicated, and for that reason, they are best addressed on the specific claims of the individual petitioner and on the record evidence that's presented. Following up on Judge Berzon's question, why shouldn't we stay the proceedings so that Cordova could have the tattoo removed? I understand there are non-profit groups that will remove a tattoo at not very large expense. Why do we send him back when there is an opportunity in this country? Somehow all the briefing was on what would happen in El Salvador or Honduras, but he could have it removed here. Two points, Your Honor. While that might be true, there is no evidence that he has, although there is evidence that he is aware of tattoo removal, there is no evidence that he has actively sought to receive those services. I agree with you, but why not now give him a chance? Well, because it's the government's position that it's not necessary in this case, because he's failed to establish, based on the evidence of record, that even with these tattoos, that there is compelling evidence that it is more likely than not that he will face torture back in El Salvador. Where is the compelling evidence from, sir, from the CAT standard? I'm sorry. Where is the compelling evidence standard from? You are correct, Your Honor. I did misspeak on that position on the compelling evidence. I thought maybe I'd forgotten something. No, Your Honor. You need to find compelling evidence to reverse. Exactly. I apologize. I'm not trying to make law about you. What about the other issue, that is this 20-year-old asylum application? Well, Your Honor, you're right. That was mentioned earlier. And in reading and preparing for this case, it was my understanding that originally he was a derivative on his mother's asylum application. But I read the record, and perhaps I read the record to mean that when, that now he is no longer a derivative on that application, that instead he, that this case arises from his own independent application, and that he's not also, it's not that he's proceeding on his own and also as a derivative. Why can't he have that? I don't know that you can't, Your Honor. I just have never heard that happening, and I did not, in preparing for this case, I was focused on this issue. It's somewhat relevant to, you know, for him to say, well, you know, I was a derivative of my mother's, you never adjudicated my mother's, now I have my own problems. So I have to basically shoot two arrows in the quiver. Well, Your Honor, he has not made that argument, and I'm not sure that. Well, I think he sort of has. I mean, he's certainly mentioned repeatedly that there's this other application out there, and that it's not completed. He references the fact that originally he was on his mother's application. I don't remember reading anything in the record. I thought he said, or maybe I read this somewhere else, that, because I thought that you fell off them once you become an adult, but apparently this one's so old that that wasn't true at that time, and therefore he's still on it. It's my understanding the same as your own, Your Honor, that at some point you are no longer grandfathered. And I think that was true, but I think it's not true to this particular one because I'm so old. But we can find out. Anyway, if there was anything in any of this, would the government be willing to mediate to try and figure it out? I'm not sure that there's any. Again, the government usually takes position that there's, if there is a good basis on the case, that the government would prefer to see the case. I know. When we were told, I was told personally by the head of your office that you're no longer taking that position. Well, then I say I'm correct, Your Honor. I apologize. Because it's not a very savory position. It means that we have to go ahead and do a bunch of work to figure something out that might not matter at all. Well, Your Honor, I think that while that may be, that is certainly one way of looking at it. The other way to look at it would be that this case has moved through the system. It is very close to a resolution one way or the other. And even assuming, which I'm not quite sure, that he is still able to be a derivative on his mother's application as has been alluded to for some unknown reason, it has not yet been adjudicated. And so the process would continue for... And you don't think it's in the government's interest to find all that out and to go talk to some, talk to one of our mediators and first find out the facts and then all you have to do is get on the telephone and say whether what, given what you've now found out, you're willing to mediate or not willing to mediate. To leave it all completely unknown. We don't know why this thing's been sitting there for all these years. We don't know whether he's on it or isn't on it. And if it has been sitting there for all these years and he would otherwise have long ago become a permanent resident here, don't you think that there's just basic fairness would say we ought to figure that out before we go and perhaps remove him, even though he should 15 years ago have become a permanent resident? Your Honor, your point is well taken, but there's also the speculation that we could also assume that the reason why this hasn't been done is perhaps his mother doesn't have a strong case. We certainly don't know what, on what basis. Why don't we just defer this case until you find out and inform us. We'll just put it on hold and you can wait. It's obvious that the court is very concerned with doing that and we couldn't do that. It's partly because, you know, there's also often the problem of not wanting to have delay, but here, you know, at least on the bare facts as far as we know, the delay is that it's been sitting there 18 years and that could be totally wrong, but that's all we know so far. The court could certainly order that and if they did, my office would certainly consider it, that is true. But you would consider it, wouldn't you? Yes, Your Honor. You would consider it? I misspoke, of course, Your Honor. Going back to initially the credibility, substantial evidence supports the credibility, the dual basis on which the adverse credibility claim was made, the inability to testify consistently as to the dates that he was shot, also the finding that the assertion that he was forcibly tattooed was inherently implausible. That is... What is, that's an inherently implausible, so that it doesn't involve speculation. I mean, all we have here, the only evidence that it, it's not inherently implausible, i.e. it's possible. And it was evidence that it's physically possible. The government's witness said he had never seen it. Correct. He'd never heard of it. He also said that if there, but that doesn't prove it's not possible, it just proves he'd never heard of it. Correct. Then he said I, that he thought it was unlikely, as I understand it, for two reasons. One is because you'd have lousy tattoos, but there was evidence that you did, in fact, have lousy tattoos. Poor ones, not as good as usual. And the second reason was that, which I understood him to be saying, because they like the tattoos to be boastful about the gang, so they wouldn't want to give it to somebody who didn't want them. Is that essentially what he's saying? Correct. But he also did say, specifically, that they do invest people into the gang involuntarily. He said that several times. They volunteer involuntarily. Involuntarily. Involuntarily. Usually by... The same witness said that. Yes. So that seems inconsistent with his notion that they don't want involuntary members, apparently. They do want involuntary members. I think what he was drawing the distinction is there are involuntary members that perhaps can be coerced through ways short of covering their body forcibly in tattoos. And the two actually, they do make sense. They don't contradict that perhaps by using less coercive ways or less time-consuming ways in the forced tattooing, perhaps they could be brought involuntarily in initially and then brought around to the idea of being in the gang. Well, I feel compelled to say something at this point just because, you know, of course I think, I mean, I would be interested in what the status is of the other, but by the same token, if there is all of that evidence before the IJ, wouldn't the IJ be entitled to weigh the evidence and make a determination that the IJ believes certain things and not other things? Correct, Your Honor. So wouldn't we be re-weighing the evidence? It is an issue of re-weighing the evidence. And if I could, I see my time is up. If I could just speak very briefly to the Kat claim in summary. Although he does point out that he was beat five times with sticks, as Judge Noonan were to say, but had previously stated, subsequent to that, both times when he needed serious medical attention, it was the police that took him to the hospital on their own initiative. It was the police who went to the hospital to seek out, to investigate, who did that to him. And it was only because he went against their recommendation that he testify against his assaulters that the case did not go forward. So there again, even if there's evidence of five assaults, there is later, more recent evidence that the police assisted him. And again, it's an issue of re-weighing the evidence. I don't know if this matters, but I'm curious why you think that was the time sequence. The record bears that out, Your Honor. I could point you to a – Well, I'll look. I wasn't aware of that. It is. It's on page 284 and 285, Your Honor. You can see that there was that chronology involved. Okay. Thank you very much. Thank you. And again, a useful argument. And I said we'd give you one minute, so let's have one minute. Let me briefly address a few points very quickly. With regard to this argument that the government makes regarding the assisting Mr. Cordova following the assaults, those assisted efforts, as the record reflects, occurred when Mr. Cordova was hospitalized. So there wasn't any suggestion or any logical possibility that the government of El Salvador was going to be torturing Mr. Cordova while he was lying prostrate in a hospital bed. Well, if they really, really, really were opposed to gangs and wanted to do them in, I suppose, and identified him as a member of them, I suppose that would be a very good time to torture him. I suppose it could be, Your Honor, but I don't think it's very likely. With regard to the derivative claim, it's our position that Mr. Cordova might still be eligible under the Child Status Protective Act because he is not married. And we do not believe – we'd have to investigate further. We do not believe that he's fully aged out. With regard to Judge Noonan's – We know for sure that, for example, his mother's still alive? His mother is certainly alive, Your Honor. Okay. If I could briefly address Judge Noonan's position regarding tattoo removal. Even if Mr. Cordova's tattoos were removed, that does not obviate his asylum issues because, as the record reflects – Well, I mean, we couldn't order someone to remove their tattoos anyway. We're not in that business. That's correct. Well, we give them the option. But what I want to point out, just in conclusion, Your Honor, is that even if they were removed, that wouldn't obviate his asylum claims because the evidence of record clearly reflects that these gang members in El Salvador remember Mr. Cordova. They're continuing to threaten his family. So even if he shows up saying tattoos, he's going to be in serious trouble if he is confronted by them. But I thought you're not – that's the one thing you're not arguing, that the other gang members is his family. With regard to – The asylum claim. The asylum claim, not Kat, Your Honor. If there aren't any other further questions. Okay. Thank you very much. Thank you both. The case of Cordova-Monsaneris is submitted. And we will go to Cole v. Holder.
judges: Noonan, Berzon, Callahan